UNION PACIFIC RESOURCES GROUP, INC., Union Pacific Oil & Gas Co., Union Pacific Resources Co., Peach Ridge Pipeline Company, L.P., Duke Energy Fuel, Inc., Rio Bravo Gas Systems, L.L.C. & Duke Energy Southwest Ozona Plant, L.L.C., Petitioners,

v.

Lowell F. HANKINS, The Ada L. Pierce Testamentary Trust & The Victor Lenore Pierce Miller Trust, Respondents.

No. 01–0836.

Supreme Court of Texas.

Argued Feb. 19, 2003.

Decided July 3, 2003.

Rehearing Denied Aug. 21, 2003.

payments based on current market value. Because a covenant to obtain the best price reasonably attainable is implied under Texas law only to proceeds leases, not to market-value leases, we conclude that the royalty owners have not established that there are "questions of law or fact common to the class" sufficient to support certification. Tex.R. Civ. P. 42. We therefore reverse the judgment of the court of appeals and remand to the trial court for further proceedings.

David M. Gunn, Beck Redden & Secrest, L.L.P., R. Doak Bishop, King & Spaulding LLP, Sashe D. Dimitroff, Clements O'Neill Pierce Wilson Fulerson, Houston, Steven C. Kiser, Harper Estes, Lynch Chappell & Alsup, P.C., Midland, Roger Townsend, Alexander Dubose Jones & Townsend, Houston, for Petitioner.

Levon G. Hovnatanian, Martin Disiere Jefferson & Wisdom, L.L.P., James L. Reed, Jr., James J. Ormiston, Looper Reed & McGraw, P.C., Robert Herring, Fleming & Associates, L.L.P., Houston, for Respondent.

Chief Justice PHILLIPS delivered the opinion of the Court.

In this case, we must determine whether a proposed class meets the requirements for class certification under Texas Rule of Civil Procedure 42. The trial court certified a class consisting of gas royalty owners in Crockett County who claim that lessees breached an implied duty to "obtain the best current price reasonably obtainable." The court of appeals affirmed. 51 S.W.3d 741. As certified, the class includes some royalty owners whose leases calculate royalty payments on an amount-realized (or proceeds) basis and other royalty owners whose leases calculate royalty

## I

Union Pacific Resources Group (UPRG) leases land in Crockett County, produces gas from that land, and pays the lessors a royalty on its gas production. This suit was filed by several royalty interest owners who alleged that UPRG had underpaid royalties. Specifically, they alleged that UPRG sold the gas to affiliated companies at preferential index prices and calculated royalty payments on the basis of the indexes used for the inter-affiliate sales, and that the UPRG affiliates then sold the gas to third parties at higher prices. The plaintiffs brought this suit on behalf of a purported class of UPRG royalty owners (collectively, the royalty owners) against UPRG and several of its affiliates (collectively, Union Pacific) for breach of an implied covenant to "reasonably market" the gas and "to obtain the best current price reasonably obtainable" for it. The royalty owners also alleged that UPRG paid "unreasonable and excessive rates" to its marketing affiliates "to market, gather, compress, treat, and transport" the gas, which increased the affiliates' profit and "decreas[ed] the amount of royalty received by Plaintiffs and class members."

Union Pacific objected to class certification, arguing that not all the leases in the purported class contained an implied covenant to reasonably market the gas. Union

Pacific conceded that it might have an implied duty to obtain the highest price reasonably available on those leases that calculate royalty payments based on the proceeds actually received by the lessee. However, it argued that it had no such duty on those leases that base royalty payments on the current market price of the gas. For those leases, royalty payments are based upon fair market value regardless of what price the lessees actually obtain for the gas.

Union Pacific does not dispute that an appropriate sale price under a market-value lease may often be roughly equivalent to an appropriate sale price under a proceeds lease, but contends that even though the two prices may be similar, they are independent of each other and are subject to different methods of evaluation. Market value is generally determined by comparing the sale price to other sales "comparable in time, quality, quantity, and availability of marketing outlets." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex.1996). The implied covenant to reasonably market, by contrast, focuses on the behavior of the lessee rather than on evidence of other sales, and asks whether the lessee acted as "a reasonably prudent operator under the same or similar facts and circumstances." *See Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567–68 (Tex.1981). Consequently, we recently noted in *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 372 (Tex.2001), that "[m]arket value may be wholly unrelated to the price the lessee receives as the proceeds of a sales contract."

Because the purported class included both market-value and proceeds leases, Union Pacific argued that the royalty owners' claims were too dissimilar to meet the initial certification prerequisites. *See* Tex.R. Civ. P. 42. Notwithstanding Union Pacific's objections, the trial court certified a class encompassing royalty owners of gas-producing leases in Crockett County in which "the gas was purchased by ... [an] affiliate of Union Pacific Resources Group," with the exclusion of "any royalty owners whose leases specifically allow for the type of affiliate transactions or index pricing used by the Defendants in this case." The propriety of the marketing fee charged to Union Pacific by its affiliates was included in the issues to be addressed on a class-wide basis, but no other post-production charges were included.

Union Pacific appealed the certification order. While the appeal was pending, this Court decided *Southwestern Refining Co. v. Bernal*, 22 S.W.3d 425 (Tex.2000), which held that "[c]ourts must perform a 'rigorous analysis' before ruling on class certification to determine whether all prerequisites to certification have been met," because " 'actual, not presumed' " conformance with the requirements of Rule 42 " 'remains ... indispensable.' " *Id.* at 435 (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). *Bernal* consequently concluded that "it is improper to certify a class without knowing how the claims can and will likely be tried" and that "[a] trial court's certification order must indicate how the claims will likely be tried so that conformance with Rule 42 may be meaningfully evaluated." *Id.* at 435. Pursuant to *Bernal*, the court of appeals abated the case so that the trial court could develop a trial plan. *Union Pac. Res. Group, Inc. v. Hankins*, 41 S.W.3d 286 (Tex.App.-El Paso 2001, no pet.).

After the trial court developed its trial plan and the case returned to the court of appeals, this Court decided *Yzaguirre*, which distinguished between market-value leases and proceeds leases. *Yzaguirre*, 53 S.W.3d at 372. We noted that

while market-value leases contain an explicit requirement to pay royalties based on "the prevailing market price at the time of the sale or use," proceeds leases merely base the royalty payment on the price actually received for the gas. *Id.* at 372. *Yzaguirre* further held that while a lessee under a proceeds lease has "an obligation to obtain the best current price reasonably available," that obligation does not extend to market-value leases. "Because [a market-value] lease provides an objective basis for calculating royalties that is independent of the price the lessee actually obtains, the lessor does not need the protection of an implied covenant" to obtain the highest price reasonably available. *Id.* at 374. *Yzaguirre* therefore confirmed Union Pacific's argument that those royalty owners with market-value leases had no cause of action for breach of an implied covenant to reasonably market oil and gas. At most, their claim was for breach of an express agreement to pay royalty based on market value.

The court of appeals acknowledged that "both parties urge that the recent Texas Supreme Court case of *Yzaguirre v. KCS Resources, Inc.* supports the merits of their positions on implied covenants (or lack thereof)," but held that it was "unnecessary to address these contentions" because "an appellate court's review of a class certification order should not include examining the merits of claims or defenses asserted by the parties." 51 S.W.3d at 750. Nor did the court consider *Yzaguirre*'s impact on the class's ability to meet the certification prerequisites of Rule 42. Instead, it simply concluded that "[w]hatever impact *Yzaguirre* may have upon this case ... remains for resolution at another stage of litigation." *Id.* Union Pacific then appealed the certification order to this Court.

II

◼ Because this is an interlocutory appeal from an order certifying a class action and there was no dissent in the court of appeals, this Court has jurisdiction only when the court of appeals "holds differently from a prior decision of another court of appeals or of the supreme court." TEX. GOV'T CODE §§ 22.225(b)(3), (c); 22.001(a)(2). Union Pacific asserts that the court of appeals' failure to analyze *Yzaguirre*'s impact on the Rule 42 requirements conflicts with *Bernal*'s requirement that courts require certification orders to demonstrate "actual, not presumed" conformance with the requirements of Rule 42. *Bernal*, 22 S.W.3d at 435. We agree. In *Bernal*, we held that in order to "make a proper analysis" of the Rule 42 factors, a court must go " 'beyond the pleadings' " and " 'must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.' " *Id.* (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996)). By choosing to delay analysis of *Yzaguirre* until "another stage of litigation," the court of appeals ignored applicable substantive law crucial to understanding the claims and defenses in this case.

◼ We have noted before that " such issues as commonality, typicality, superiority, and predominance are at least tangentially related to the merits; *i.e.*, one cannot know whether a representative's claim is 'typical' of those of the class without knowing something about the merits." *In re Alford Chevrolet–Geo*, 997 S.W.2d 173, 182 (Tex.1999) (quoting David Crump, *What Really Happens During Class Certification? A Primer for the First–Time Defense Attorney*, 10 REV. LITIG. 1, 7 (1990)). While such analysis for purposes of certification is far less searching than in a trial on the merits, we conclude that the sub-

stantive law announced in *Yzaguirre* must be taken into consideration in determining whether the purported class can meet the certification prerequisites under Rule 42.

## III

In order to maintain a class action, Rule 42 requires that plaintiffs meet each of the requirements under 42(a) and at least one of the requirements under 42(b). Here, the trial court found that the royalty owners had demonstrated compliance with all four of the initial requirements of 42(a), including (1) numerosity, that "the class is so numerous that joinder of all members is impracticable"; (2) commonality, that "there are questions of law or fact common to the class"; (3) typicality, that "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) adequacy of representation, that "the representative parties will fairly and adequately protect the interests of the class." Tex.R. Civ. P. 42(a). The court also held that the royalty owners had met three of the 42(b) requirements, including 42(b)(1)(A) (risk of inconsistent adjudications), (b)(2) (need for declaratory/injunctive relief), and (b)(4) (predominance of common questions). Tex.R. Civ. P. 42(b).

▮ We turn first to the commonality requirement. In its trial plan, the trial court identified what it believed to be eleven common issues:

(1) Did [a] Union Pacific marketing affiliate purchase from the Union Pacific producing affiliate the gas that [the] Union Pacific producing affiliate produced from the lands under which the class members own a royalty interest?

(2) If so, were the class members paid royalty based on the price that the Un-

ion Pacific producing affiliate received for its gas from the Union Pacific marketing affiliate, instead of on the price that the Union Pacific marketing affiliate received in the subsequent sale of the gas to independent third-party purchasers?

(3) If so, was the price that the Union Pacific marketing affiliate received for the gas from independent third-party purchasers higher than the amount it paid the Union Pacific producing affiliate for the gas?

(4) If so, did this sale of gas for a price below the amount actually received from third parties breach the implied covenant to reasonably market?

(5) If so, what are the damages proximately caused by this breach of the implied covenant to reasonably market?

(6) Was a marketing fee assessed against the class members?[1]

(7) If so, did the marketing fee breach the implied covenant to reasonably market?

(8) If so, what are the damages proximately caused by this breach of the implied covenant to reasonably market?

(9) Should any or all of the defendants be regarded as one and the same, i.e. should their corporate separateness be disregarded because they have (a) operated as alter egos of one another; or (b) operated as a single business enterprise; or (c) used the corporate fiction as a means to perpetuate a fraud or to evade a legal obligation?

(10) Some of the defendants have pled modification, ratification, waiver, estoppel, laches, other defenses, the failure to meet contractual conditions precedent,

---

1. As noted above, there was no allegation that the royalty owners themselves were asked to pay the marketing fee; rather, the fee was allegedly paid by Union Pacific to its affiliates and was included in the royalty owners' allegations of improper affiliate transactions.

and course of performance. Which, if any, are viable defenses in this case? (11) Which, if any, should be submitted to the jury based on the evidence, and for which defendants?

▮ In evaluating whether these issues satisfy the commonality requirement, we note that "the threshold for commonality is not high." *Phillips Petroleum Co. v. Bowden,* 108 S.W.3d 385 (Tex.App.-Houston [14th Dist.] 2003, no pet. h.). Yet it does require at least one issue of law or fact "that inheres in the complaints of all class members." *Id.; see also Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986); *Graebel/Houston Movers, Inc. v. Chastain,* 26 S.W.3d 24, 33 (Tex. App.-Houston [1st Dist.] 2000, pet. dism'd w.o.j.). A common issue must also be "applicable to the class as a whole" and be "subject to generalized proof." *Nichols v. Mobile Bd. of Realtors, Inc.,* 675 F.2d 671, 676 (5th Cir.1982).

Even under the commonality requirement's low threshold, we conclude that not one of the enumerated issues both "inheres in the complaints of all class members" and is "subject to generalized proof." Questions (4), (5), (7), and (8) ask specifically whether the defendants "breached the implied covenant to reasonably market" by failing to obtain arm's length prices. Since *Yzaguirre* held that market-value leases have no such implied covenant, these questions cannot satisfy the commonality requirement in a class that includes both proceeds leases and market-value leases. Questions (1), (2), (3), (6), and (9) question whether UPRG engaged in a sham transaction by charging its affiliates a preferential price. Question (3), though it appears to ask whether the royalty owners themselves were charged a marketing fee, actually questions the propriety of a marketing fee allegedly paid by Union Pacific to its affiliates. The royalty owners argue that the marketing affiliate did nothing to earn the fee, but that the fee was a sham which only served to decrease the amount of money that Union Pacific appeared to receive from its sales. Again, however, these inter-affiliate transactions do not determine the amounts owed under market-value leases—under a market-value lease the producer need not attempt to obtain the best price available. *Yzaguirre,* 53 S.W.3d at 373. A producer could provide its affiliate with gas at any price it chose, but the royalty owners would be protected because their payments would be "based on the prevailing market price at the time of sale." *Id.* at 372. Similarly, the producer could choose to pay its affiliates a marketing fee, and this payment would not reduce the gas price that it was obligated to pay the lessors—the inter-affiliate transaction might reduce the proceeds it purported to receive, but it could not reduce the objective market value of the gas.

Thus, the question under a market-value lease would be whether the lessees paid royalties based on market value, while the question under a proceeds lease would be whether the proceeds actually received by the lessee were a fraud or a sham. These are different inquiries. Under some circumstances, a reasonable marketer may sell gas for more or less than market value, as when a lease is subject to a long-term purchase contract. *See, e.g., Yzaguirre,* 53 S.W.3d at 370 (noting that the lessee sold the gas "for more than market value under a long-term sales contract"); *Tex. Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 871 (Tex.1968) (noting that the lessee sold gas for less than market value under a similar long-term sales contract). As we have previously noted, there is no "absolute duty to sell gas at market value under a 'proceeds' royalty clause." *Amoco Prod. Co. v. First Baptist Church,* 611 S.W.2d 610, 610 (Tex.1980) (per curiam).

The royalty owners argue that the distinction between market-value leases and proceeds leases is immaterial here. Specifically, they assert that in this case market value is equal to the best price reasonably attainable, and that both are equal to the amount that Union Pacific affiliates received from third-party purchasers. Whether these prices are in fact equal, however, is a question that remains to be proven. The question before us at this time is merely whether such unity of value can be established through common proof, and we hold that it cannot.

This lack of commonality becomes clear if we hypothesize that the royalty owners are able to establish at trial that the affiliate transactions were in fact a sham. Could the trial court then infer that the third-party sale price represented both market value and the best price reasonably attainable? No, because the marketing affiliates may have been able to receive a price higher than market value, either through a long-term contract as in *Yzaguirre* or simply through extraordinary negotiation and sales efforts that exceeded the results reasonably obtainable by an ordinary lessee. Under this scenario, the proceeds owners would be entitled to share in the lessee's good fortune, while market-value owners would not be. *Vela,* 429 S.W.2d at 871; *Yzaguirre,* 53 S.W.3d at 373. Conversely, the third-party sale price might conceivably be lower than market value, in which case the proceeds owners would receive less than the market-value owners. Consequently, a finding that Union Pacific engaged in a sham transaction might affect the outcome of the proceeds owners' claims, but would not determine its liability to the market-value owners. Further analysis would be needed to determine whether market-value owners were indeed paid market value. Consequently, neither questions addressing the purported breach of the covenant to reasonably market nor questions ad-

dressing the price differential between the affiliate transactions and third-party sales can serve as common questions uniting a single class.

Finally, Questions (10) and (11) deal with possible defenses, including the catch-all category of "other defenses." The royalty owners have not argued that these two issues are "applicable to the class as a whole" and "subject to generalized proof." *Nichols,* 675 F.2d at 676. Consequently, we need not determine whether these issues, standing alone, can establish sufficient commonality on which to base a single class.

### IV

We conclude that certification is improper because none of the issues identified in the trial plan satisfy the commonality requirement of Rule 42. Accordingly, we need not consider Union Pacific's additional challenges to the other certification prerequisites. We reverse the court of appeals' judgment and remand this case to the trial court for further proceedings consistent with this opinion.