**ENRON OIL & GAS COMPANY, EOG Resources, Inc., Enron Oil & Gas Carthage, Inc., Enron Oil & Gas Acquisitions, L.P. and EOG Resources Acquisitions, L.P., Appellants,**

v.

**Olin V. JOFFRION, Jr., Trustee of the Olin V. Joffrion Family Trust No. One, Appellee.**

No. 12–01–00347–CV.

Court of Appeals of Texas, Tyler.

July 31, 2003.

Edward John O'Neill Jr., for appellant.

Robert A. Chaffin, Chaffin Law Firm, P.C., Houston, for appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and DeVASTO, J.

## OPINION

SAM GRIFFITH, Justice.

EOG Resources, Inc. and EOG Resources Acquisitions, L.P. f/k/a Enron Oil & Gas Company, Inc. ("EOG") bring this

interlocutory appeal from a class certification order in which the trial court certified a class premised upon breaches of express and implied covenants in oil and gas leases held by the approximately 300 members of the purported class. We reverse and remand for decertification.

## BACKGROUND

EOG is a current or previous lessee, and a current and former operator. As a current operator, EOG is responsible for remitting royalty payments under forty-five oil, gas and mineral leases in the Carthage Fieldwide Gas Unit located in Panola County, Texas. EOG produces and sells gas from lands covered by the leases in the Carthage Gas Unit. Class representative Olin V. Joffrion, Jr., Trustee for the Olin V. Joffrion Family Trust No. One ("Joffrion"), claims a royalty interest under an oil, gas and mineral lease covering land located in the Carthage Gas Unit.

Joffrion filed suit against EOG alleging that it failed to pay proper royalties, failed to market the gas in a reasonable manner, and failed to satisfy certain notification requirements of the Royalty Reporting Standards. Joffrion subsequently moved to certify a class of all royalty owners in the Carthage Gas Unit. Joffrion identified three issues on which certification was sought: 1) whether EOG charged expenses not authorized by the leases; 2) whether EOG assessed higher operating expenses than a reasonably prudent operator would have charged, and in doing so breached an implied duty to reasonably manage the leases; and 3) whether EOG failed to pay fair market value for gas and natural gas liquids. In support of his motion for class certification, Joffrion claimed that all royalty owners in the Carthage Gas Unit have leases containing an express provision relating to the charging of costs, that the leases contain "virtually the same terms and provisions regarding royalty payments," and that each of these leases is "typical of the other."

There are forty-five leases in the Carthage Gas Unit under which royalties have been paid during the relevant time period. According to EOG, these leases utilize at least eight standard lease forms. There are also additional leases which are typed, using no standard form. The gas royalty provisions of the leases in question range from requiring royalties to be paid based on the net proceeds received, to leases requiring royalties to be paid based on market value at the well, to leases requiring royalties to be paid based on a fixed price. Also, the leases address the lessee's use of gas in different ways and have different provisions governing other aspects of the payment of royalties.

The trial court rejected certification of the market value issue, but granted certification based upon two of Joffrion's complaints. The certification order states that the first issue to consider is whether EOG "charged production expenses consisting of compression charges to royalty owners and, if so, what amount was charged to royalty owners during the period in question." The order states that this issue is predicated upon breach of the express covenant found in the leases that royalty is to be free of production expenses. The second issue to be determined is whether EOG charged "royalty owners with post-production expenses greater than those which a reasonably prudent operator would have charged and, if so, what is the amount overcharged in each of the specific categories challenged." This issue is predicated upon breach of the implied covenant to reasonably manage the leases.

EOG appeals on the following issues: 1) Did the trial court abuse its discretion by certifying a class without properly applying the substantive law to Joffrion's claims

as required by Rule 42; 2) Did the trial court abuse its discretion in certifying a class where the predominance requirements of Rule 42 cannot be satisfied; 3) Did the trial court abuse its discretion by entering a class certification order which does not satisfy the requirements of *Bernal*; and 4) Did the trial court abuse its discretion by appointing Joffrion as class representative.

### STANDARD OF REVIEW FOR CLASS CERTIFICATION

 An appellate court should reverse a trial court's certification order only if the record shows that the trial court committed a clear abuse of discretion. *E & V Slack, Inc. v. Shell Oil Co.*, 969 S.W.2d 565, 567 (Tex.App.-Austin 1998, no pet.). An abuse of discretion occurs if the trial court acts without reference to any guiding principles or acts arbitrarily or unreasonably. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). A failure to analyze or apply the law correctly is an abuse of discretion. *Huie v. DeShazo*, 922 S.W.2d 920, 927–28 (Tex.1996). An appellate court, in reviewing a trial court's decision, should not err in favor of certification. *See Southwestern Ref. Co. v. Bernal*, 22 S.W.3d 425, 434–35 (Tex.2000). Although the ultimate issue at the trial court level is whether the defendant breached both express and implied covenants, the question before *us* is whether the propriety of its conduct can and should be decided on a class-wide basis. This court "may not consider the substantive merits of the case, and class proponents are not required to prove a prima facie case in order to be certified as a class." *Reserve Life Ins. Co. v. Kirkland*, 917 S.W.2d 836, 842 (Tex.App.-Houston [14th Dist.] 1996, no writ), *overruled, Bernal*, 22 S.W.3d at 434. However, to make a proper analysis, "going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano v. American Tobacco Co.*, 84 F.3d 734, 742 (5th Cir. 1996).

### RULE 42

#### *Rule 42(a) Requirements*

Under Rule 42(a) of the Texas Rules of Civil Procedure, all class actions must satisfy four requirements: 1) numerosity ("the class is so numerous that joinder of all members is impracticable"); 2) commonality ("there are questions of law or fact common to the class"); 3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and 4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). Tex.R. Civ. P. 42(a). The only 42(a) requirement disputed in this case is adequacy of representation.

#### *Adequacy of Representation*

 Adequacy of representation requires that the class representatives' interests cannot be "antagonistic" to the interests of the rest of the class. Tex.R. Civ. P. 42(a). Secondly, the class representatives, through their counsel, must show the court that they will vigorously prosecute the action. *Id.* The Texarkana Court of Appeals has listed certain relevant factors to consider in determining if the adequacy of representation element is satisfied: 1) adequacy of counsel; 2) potential for conflicts of interest; 3) personal integrity of the plaintiffs; 4) whether the class is unmanageable because of geographic limitations; 5) whether the representative plaintiffs can afford to finance the class action; and 6) the representative plaintiffs' familiarity with the litigation and his or her belief in the legitimacy of the action. *Glassell v.*

*Ellis,* 956 S.W.2d 676, 682 (Tex.App.-Texarkana 1997, no pet.).

EOG takes the position that Joffrion cannot adequately represent the class because of his inability to finance the class action, and his unfamiliarity with the litigation. At the certification hearing, Joffrion testified that he had worked in the family oil and gas business for ten years. He asserted that he had served previously as a class representative in two other royalty disputes, and that he assisted counsel in both cases in which the royalty owners prevailed. He admitted that the trust had only received approximately $2,600.00 in royalties from the Carthage Unit in the previous five years. Joffrion explained what he understood the lawsuit to be about, and claimed that he initiated the litigation based upon his own personal belief that EOG was charging too much for expenses. His attorneys then testified that they were financing the class action, and that they would have no trouble doing so. Based upon this testimony, we hold that the trial court did not abuse its discretion when it appointed Joffrion class representative. Accordingly, we overrule issue four.

### Rule 42(b) Requirements

If the 42(a) elements are satisfied, the trial court must then determine if the class action is maintainable. TEX.R. CIV. P. 42(b). There are four subsections of 42(b), at least one of which must be satisfied before class certification is appropriate:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which

would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) where the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

(4) the court finds that the questions of law or fact common to the members of the class **predominate** over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

TEX.R. CIV. P. 42(b)(emphasis added). Joffrion seeks certification under (4).

### Predominance

■■■■ Under Rule 42(b), "common" questions must predominate over questions affecting only individual class members. TEX.R. CIV. P. 42(b)(4). A common question exists when the answer as to one class member is the same as to all. *Spera v. Fleming, Hovenkamp & Grayson, P.C.,* 4 S.W.3d 805, 810 (Tex.App.-Houston 1999, no pet.). Common questions that do not produce common answers do not satisfy the Rule 42 commonality requirement. *Wente v. Georgia–Pacific Corp.,* 712 S.W.2d 253, 257 (Tex.App.-Austin 1986, no writ). The "predominance requirement ... is one of the most stringent prerequisites to class certification." *Bernal,* 22 S.W.3d at 433. Courts determine if com-

mon issues predominate by identifying the substantive issues that will control the outcome of the litigation, assessing which issues will predominate, and determining if the predominating issues are, in fact, common to the class. *Id.* at 434. The test for predominance is not whether common issues outnumber uncommon issues, but whether common or individual issues will be the subject of most of the litigants' and court's efforts. If, after common issues are resolved, presenting and resolving individual issues is likely to be an overwhelming or unmanageable task for a single jury, then common issues do not predominate. *Id.* Ideally, a judgment in favor of the named plaintiffs should decisively settle the entire controversy, and all that should remain is for other class members to file proofs of claim. *Id.*

### Breach of Express Covenant

 The first question certified by the trial court is whether EOG charged production expenses to royalty owners in breach of an express covenant. Royalty is commonly defined as the landowner's share of production, free of expenses of production. *Heritage Resources v. NationsBank,* 939 S.W.2d 118, 121–22 (Tex. 1996). Although it is not subject to the costs of production, royalty is usually subject to post-production costs, including taxes, treatment costs to render it marketable, and transportation costs. *Id.* at 122. But express covenants must be ascertained from the provisions of each individual oil and gas lease. *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 870 (Tex.1968). Even though there are general rules as to production and post-production expenses, the parties may modify these general rules by agreement. *Martin v. Glass,* 571 F.Supp. 1406, 1410 (N.D.Tex.1983), *aff'd,* 736 F.2d 1524 (5th Cir.1984)(citing 3 Howard R. Williams & Charles J. Meyers, Oil and Gas Law § 645 p. 591, et seq. (1990)).

### Analysis

 Randall Lee Stanger, the revenue accounting supervisor for EOG's Oklahoma City/Tyler division, testified that every royalty owner received the identical price per unit for all gas produced from the Carthage unit. The payment of all royalties was computed on an index price rather than the actual price for which it sold or on a market value price. Stanger also stated that a compression expense was deducted from every royalty paid. This was true without regard for the express terms of the lease.

 Joffrion contends that certifying a class action is appropriate in this case because

> [royalty owners] have been treated identical for how many years now, I don't know, at least since 1996. All accounting methods are identical. All pricing is identical. All expense deductions are identical. All volumetric deductions are identical. Every royalty owner has been treated in a common and typical way by [EOG]. And what they don't want us to do now is go forward in a common and typical manner. They're saying, "Even though we treat you the same, to come back against us, you got to divide into 45 little groups," which they know can't be done, Your Honor.

Joffrion maintains that the court could and should treat all the leases the same, even though the parties admit that the leases are *not* the same. We do not agree. It should go without saying that a breach is determined by comparing the terms of a contract with the actions of the alleged breaching party. *See Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex.1966)(a court cannot determine if a contract has been breached unless it can ascertain the legal obligations of the parties). In the case

before us, a jury would have to look at forty-five individual leases and determine that each lease contained an express covenant not to deduct compression charges as a production expense from royalties. Only then could the jury decide if, in fact, EOG breached that express covenant.

For example, Sam Cobb, EOG's expert witness, testified that he had divided the forty-five leases into twelve groups. In one group, the leases provide for a gas royalty based on "the net proceeds derived from the sale of gas from each well where gas only is found while the same is being sold or used off the lease premises." Cobb noted that there is no provision detailing how to pay royalties if the sale occurs at the well as opposed to off the premises. In a second set of leases, the royalty is based upon the value of the gas. However, the lease fails to state whether it is the value of the gas at the mouth of the well or whether it is at the point of sale. These different royalty clauses, as well as the matters which are open to interpretation in these royalty clauses, are significant because the deduction of expenses, whether it be production or post-production, is integral to the royalty calculation.

It is clear that there can be no presumption that an express term exists in each lease; that question must be resolved on a case-by-case basis. Consequently, individual, not common, issues would be the focus of the parties' efforts in a trial on the merits. We hold, therefore, that the trial court erred when it ruled that the issue of the express covenant not to charge royalty owners with production expenses is a predominant issue in this case.

### Breach of Implied Covenant

 The second question certified by the trial court is whether EOG charged post-production expenses to royalty owners in breach of an implied covenant to charge expenses no greater than those which a reasonably prudent operator would have charged. The only way to determine whether a particular lease contains an implied covenant is to examine the express terms of the lease. *See Yzaguirre v. KCS Resources, Inc.,* 53 S.W.3d 368, 373 (Tex.2001). For example, a covenant will not be implied unless it appears from the express terms of the contract that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it and therefore they omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument. *Union Pacific Resources Group, Inc. v. Neinast,* 67 S.W.3d 275, 281 (Tex.App.-Houston [1st Dist.] 2001, no pet.). Covenants are implied, therefore, only when deemed fundamental to the purpose of a mineral lease and the lease does not expressly address the subject matter the covenant sought to be implied. An implied covenant is not to be assumed; the court must examine the leases under consideration to determine whether the parties expressly agreed or stipulated to the subject matter of the covenant sought to be implied. *Id.* at 282.

 Further, once it is determined that a lessee is bound by implied obligations relating to operation on the leasehold, the question arises regarding the standard of conduct to which the operator is held. In Texas, the "reasonably prudent operator" standard is the general rule governing performance of implied lease covenants. *United States Steel Corp. v. Whitley,* 636 S.W.2d 465, 471 (Tex.App.-Corpus Christi 1982, writ ref'd n.r.e.). It is possible, however, for a lessee to lessen the burden of the prudent operator standard by express provision specifying a lower standard. *See Coats v. Brown,* 301 S.W.2d 932, 935–36 (Tex.Civ.App.-Texarkana 1957,

no writ); *Magnolia Petroleum Co. v. Page,* 141 S.W.2d 691, 693 (Tex.Civ.App.-San Antonio 1940, writ ref'd).

### Analysis

 Joffrion maintains that there is a covenant implied in each of the forty-five leases that EOG will not charge post-production expenses greater than would a reasonably prudent operator. In the recent supreme court opinion, *Union Pacific Resources Group, Inc. v. Hankins,* No. 01–0836, 111 S.W.3d 69, 2003 WL 21512615, 2003 Tex. LEXIS 112 (Tex. July 3, 2003), the court reviewed the certification of a class which claimed that lessees breached an implied duty to "obtain the best current price reasonably obtainable." *Id.* at 70, 2003 WL 21512615 at *1, 2003 Tex. LEXIS 112 at *1. The court held that because a covenant to obtain the best price reasonably attainable is implied under Texas law only to proceeds leases, not to market-value leases, the royalty owners could not establish that there were "questions of law or fact common to the class" sufficient to support certification. *Id.* (quoting TEX.R. CIV. P. 42). As in *Union Pacific,* each lease in this case must be analyzed to determine if there is, in fact, an implied duty not to charge post-production expenses greater than would a reasonably prudent operator. The possible permutations of the leases are endless. In one lease there might be an express covenant on this subject, and therefore no implied covenant. In another lease, there might be an implied covenant, but the lessee's burden has been lessened. Therefore, because there is no evidence that every lease has an implied covenant to refrain from charging post-production expenses greater than would a reasonably prudent operator, the royalty owners cannot establish that common questions of law or fact predominate over individual issues. We sustain issues one and two.

### Bernal Trial Plan

 In their third issue on appeal, EOG complains that the certification order is deficient because it does not include a *Bernal* trial plan. The following is the trial court's order:

The requirements of [*Bernal*] have been met since the common and predominating issues of the case will be the object of all of the efforts of the litigants and the court with no individual issues to be determined. In order to resolve all disputes presented in this case, it will be necessary for the plaintiffs to submit evidence in support of the following factual issues and none other: (1) Did Enron charge production expenses consisting of compression charges to royalty owners and, if so, what amount was charged to royalty owners during the period in question; and (2) Did Enron charge royalty owners with post-production expenses greater than those which a reasonably prudent operator would have charged and, if so, what is the amount overcharged in each of the specific categories challenged. Production expenses are generally defined as those expenses incurred in bringing the gas to the mouth of the well whereas post production expenses are those expenses incurred in readying the gas for marketing after it has reached the mouth of the well. Post production expenses include such things as plant fuel, processing and transportation. The evidence concerning compression as a production expense as well as the evidence concerning whether post production overcharges were made and the exact amounts involved will be presented via expert testimony. Answers to these two special issues along with an attorney fee submission will allow the total quantum of damages to be determined. In the final

judgment, all damages found will be proportionately divided among the class members according to a ratio of each class member's production to the unit total production for the time period involved in this case. The volumetric data necessary for this determination is located within Enron's existing database. The first of these two issues is predicated upon breach of the express covenant found in the leases that royalty is to be free of production expenses while the second issue is premised upon breach of the implied covenant to reasonably manage the leases. It is anticipated that plaintiffs can present their case within a two day time period.

We agree that the above order is not sufficiently detailed to serve as a *Bernal* trial plan. It simply reiterates the two causes of action which the trial court agreed to certify. Accordingly, we sustain issue three.

### CONCLUSION

We conclude that certification is improper because none of the issues identified in the trial court's order satisfies the predominance requirement of Rule 42. Accordingly, we *reverse* the judgment and *remand* this case to the trial court for further proceedings consistent with this opinion.