# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================

## ON MOTION FOR REHEARING

========================

## NO. 03-04-00820-CV

Tana Oil and Gas Corporation, Appellant

v.

Richard G. Cernosek; CER-MOR-LEB, a General Partnership; and
Garth C. Bates, Appellees

FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT
NO. 96V-138, HONORABLE DAN R. BECK, JUDGE PRESIDING

## O P I N I O N

We grant the motion for rehearing solely on the issue of attorney's fees and withdraw our opinion and judgment of December 14, 2005. We substitute this opinion, delete the remand to the district court, and render judgment that Tana is not entitled to recover attorney's fees. The motion for rehearing is overruled in all other respects.

Tana Oil and Gas Corp. (Tana) appeals the district court's grant of partial summary judgment holding that Tana breached the terms of its oil and gas lease agreements with appellees, a class of mineral-interest owners (the "Class"), by underpaying royalties owed to Class members

and by deducting gas-lift fees from certain Class members' royalty payments. Tana also appeals the district court's grant of summary judgment awarding damages and attorney's fees to the Class. Tana contends that it paid royalties based on 100% of the amount it realized from the sale of gas produced from the Class members' leases and that the plain language of the royalty provisions permits the deduction of reasonable post-production costs. Tana also claims that it did not impermissibly deduct gas-lift fees. Tana insists that the district court improperly denied its counter-motion for summary judgment because it did not breach any Class member's lease agreement as a matter of law.[1] We agree with Tana and reverse the district court's partial summary judgment and render judgment in favor of Tana. Consequently, we also reverse the district court's summary judgment awarding damages and attorney's fees to the Class.

## Background

All members of the Class owned royalty interests in a series of wells located in Fayette County and executed a gas lease with Tana. This dispute involves Tana's alleged underpayment of royalties to Class members from 1992 to 1995. In March 1992, Tana entered into a field-wide gas purchase and processing contract (the "gas contract") with Clajon Gas Company, L.P. Tana agreed to sell Clajon all gas produced from the Class's combined leases and the right to process it. In exchange, Clajon agreed to pay Tana: (1) 84% of the combined monthly sales prices

---

[1] Tana also claims that the district court: (1) erred by denying its motion for summary judgment on the basis of the statute of limitations; and (2) abused its discretion in modifying the Class and in not preparing a trial plan. Because we hold that Tana did not breach the Class's lease agreements as a matter of law, we do not reach these issues.

2

of the component-plant products[2] extracted from the raw gas; and (2) 84% of the alternate market resale price for all residue gas remaining after treatment.[3] Under the initial gas contract, title to the gas passed from Tana to Clajon upon delivery at the wellhead.

On July 1, 1992, three transactions involving the Class's gas occurred: (1) Clajon assigned its interest in the gas contract to Aquila Southwest Pipeline Corporation (Aquila); (2) Aquila assigned its interest in the gas contract to Fayette County Gathering System (Fayette); and (3) Fayette entered into a separate gas purchase and processing contract (the "resale contract") with Aquila. Under this resale contract, title to the gas passed from Fayette to Aquila upon delivery at the wellhead. As a result of the assignments and the resale contract, title to the gas passed twice—from Tana to Fayette and from Fayette to Aquila—before any raw gas was processed. Although the title to the gas passed twice at the wellhead, the final sales price under each contract was contingent on the downstream monthly sales price of the residue gas and the extracted liquids.

After the raw gas was processed, the residue gas and the extracted liquids were sold. Tana received monthly checks for its 84% share of the proceeds from these monthly sales. The parties agree that all costs associated with treating and compressing the gas were deducted from

---

[2] The contract defined "component plant products" as the liquid hydrocarbons extracted from the gas by the processor that are independently marketable apart from the gas. These hydrocarbons include: ethane, propane, iso-butane, normal butane, and pentanes. We will refer to the component plant products as the extracted liquids.

[3] The contract defined "Residue gas" to mean the portion of gas remaining at the outlet of the processing plant after extraction of plant products, fuel requirements, losses and other usage within the plant and Buyer's pipeline, plus any gas that by-passed the processing plant.

Tana's 84% share prior to Tana receiving its monthly checks.[4] These expenses are generally referred to as post-production costs. *See Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 134 (Tex. 1996); *Heritage Res., Inc. v. Nationsbank*, 939 S.W.2d 118, 122 (Tex. 1996). It is also undisputed that Aquila used a portion of the gas produced to fuel its processing plant and compressors. In order to calculate each Class member's monthly royalty payment, the sum of the amounts Tana received—its 84% share of the proceeds generated from the sales of the residue gas and the extracted liquids, plus the reimbursement received for compression costs—was multiplied by each Class member's fractional royalty interest.

The underlying litigation began in May 1996 when Garth Bates sued Tana for breach of contract for improperly deducting post-production costs from his royalty payments. *See Tana Oil & Gas Corp. v. Bates*, 978 S.W.2d 735, 738 (Tex. App.—Austin 1998, no pet.). Bates's original petition alleged that he brought his suit on behalf of the class of persons to whom Tana made royalty payments under leases covered by the gas contract. He attempted to have this broad class certified, but the district court refused because it "could not overcome the need to consider the royalty clause in each applicable lease." Bates then moved that the class definition be limited to royalty owners whose leases with Tana contained one specific royalty provision.[5] The district court certified this

---

[4] However, all compression costs that were initially deducted were reimbursed to Tana under the terms of a separate agreement. Under the terms of that agreement, Tana received a monthly reimbursement check through its sister company TECO.

[5] The royalty provision stated that Tana as lessee was "to pay lessor for gas and casinghead gas produced from said land (1) when sold by lessee, [royalty fraction] of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, [royalty fraction] of the amount realized from the sale of gasoline or other products extracted therefrom and [royalty fraction] of the amount realized from the

4

more limited Class in February 1998.  *See id.* at 744 (affirming on interlocutory appeal district court's order certifying Class).

In March 2001, the Class filed its sixth amended petition in which it suggested that the class definition be amended to include certain royalty owners whose leases contained royalty provisions that were substantially similar to the previously certified definition.  In January 2002, the district court modified its original class certification order to include mineral-interest owners with any of the following three royalty clauses:

> [1]  . . . to pay lessor for gas and casinghead gas produced from said land (1) when sold by lessee, [royalty fraction] of the amount realized by lessee, computed at the mouth of the well. . . ;

> *or*

> [2]  The royalties to be paid by Lessee are: . . . (b) on gas, including casinghead gas and all (or other) gaseous substance(s), produced from said land provided that on gas sold at the well(s) the royalty (royalties) shall be [royalty fraction] of the amount realized from such sale. . . .

> *or*

> [3]  Royalty on Gas: Lessee shall pay to Lessor as royalty on gas, including casinghead gas or other gaseous substance(s) produced from said land and sold on or off the premises [royalty fraction] of the net proceeds at the well received from the sale thereof. . . .

*See Tana Oil & Gas Corp. v. Cernosek*, No. 03-02-00096-CV, 2002 Tex. App. LEXIS 2560 (Tex. App.—Austin April 11, 2002, pet. denied) (not designated for publication) (dismissing Tana's appeal

---

sale of residue gas after deducting the amount used for plant fuel and/or compression. . . ."

5

of class modification and holding that modification makes no fundamental change in class certification order).

The modified Class moved for partial summary judgment on its breach of contract claim, insisting that Tana breached the lease agreement as a matter of law because Tana did not pay royalties based on 100% of the gross metered volumes of gas sold at the well. Essentially, the Class maintained that Tana breached the lease agreement by calculating the Class's royalty payments based on 84% rather than 100% of the post-processing sales proceeds received from the sale of the residue gas and extracted liquids. The Class further alleged that Tana breached the lease agreement by not paying royalties on gas that the processor consumed in order to treat and compress the gas, by improperly burdening the royalty owners with post-production charges stemming from the compression and treating of the gas that occurred downstream after the gas had already been sold twice at the wellhead, and by impermissibly deducting gas-lift fees from certain Class members' royalty payments. The Class also moved for summary judgment on damages and attorney's fees. In response, Tana filed a cross-motion for summary judgment, contending that it paid royalties based on 100% of the amount it realized from its sale of the raw gas at the well and insisting that the plain language of the leases permits the deduction of reasonable post-production costs, as well as the gas-lift fees in question.

In September 2004, the district court granted both of the Class's summary-judgment motions and denied Tana's. The final judgment did not state the grounds on which the district court relied. The district court awarded the Class $1,267,470.33, plus prejudgment interest of

$937,846.72, for their unpaid royalty interests. The district court also awarded the Class $780,860 in attorney's fees. This appeal followed.

**Standard of Review**

We review the district court's summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215; *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 291 (Tex. 2004) (citing *Knott*, 128 S.W.3d at 215-16).

When both parties move for summary judgment and the district court grants one motion and denies the other, the reviewing court should review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment the district court should have rendered. *Texas Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). The reviewing court must affirm summary judgment if any of the summary judgment grounds are meritorious. *Patient Advocates*, 136 S.W.3d at 648; *FM Props.*, 22 S.W.3d at 872; *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

**Discussion**

Tana contends that the district court erred by denying its motion for summary judgment and by granting the Class's motions. Tana maintains that it complied with the plain language of the applicable royalty provisions by calculating royalties owed to the Class based on 100% of the amount Tana realized from its sale of the gas. Tana also avers that any gas-lift deductions were permitted under the terms of the applicable lease agreements. Accordingly, Tana asserts that it did not breach any Class member's lease agreement as a matter of law. We agree.

An oil and gas lease is a contract, and its terms are interpreted as such. *See Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002); *Skelly Oil Co. v. Archer*, 356 S.W.2d 774, 778 (Tex. 1961). Construing an unambiguous lease is a question of law for the court. *Anadarko*, 94 S.W.3d at 554; *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). Accordingly, we review lease-construction questions *de novo*. *See Anadarko*, 94 S.W.3d at 554; *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex. 1999). In construing an unambiguous lease, our primary duty is to ascertain the parties' intent as expressed within the lease's four corners. *Anadarko*, 94 S.W.3d at 554; *see also Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 372 (Tex. 2001); *Luckel*, 819 S.W.2d at 461. We give the language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions. *Anadarko*, 94 S.W.3d at 554; *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966). We examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent, because we presume that the parties intended every clause to have effect. *Anadarko*, 94 S.W.3d at 554; *Heritage Res.*, 939 S.W.2d at 121; *Luckel*, 819 S.W.2d at 462. However, we will not hold the lease's language to impose a special limitation

8

unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning. *Anadarko*, 94 S.W.3d at 554; *Fox*, 398 S.W.2d at 92.

### Tana's royalty obligations

Tana is required to calculate royalties owed to the Class based on three royalty provisions contained in the various lease agreements. *See Alameda Corp. v. Transamerican Natural Gas Corp.*, 950 S.W.2d 93, 97 (Tex. App.—Houston [14th Dist.] 1997, writ denied) (recognizing that royalty payments must be determined from provisions of oil and gas lease). Depending on which of the three applicable royalty provisions is contained in a Class member's lease, Tana is obligated to pay a fractional share of either the "amount realized" or "net proceeds" from its sale of the gas at the well. The term "amount realized" has been construed by Texas courts to mean the proceeds received from the sale of the gas or oil. *See Yzaguirre*, 53 S.W.3d at 372-73; *Heritage Res.*, 939 S.W.2d at 121 (recognizing that royalty is calculated from proceeds when royalty provision is based upon amount realized); *Exxon Corp. v. Triphene Middleton*, 613 S.W.2d 240, 242-46 (Tex. 1981) ("If the parties intended royalties to be calculated on the amount realized standard, they could and should have used only a proceeds-type clause."); *see also* 8 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law, Manual of Terms 45 (2004) (defining amount realized to mean, "A term that is used in the royalty clause or an oil division clause that is commonly viewed as synonymous with proceeds."). In its motion to amend the class definition, the Class stated, "The terms amount realized, proceeds and net proceeds computed at the wellhead are synonymous: they refer to the money obtained by an actual sale." The phrase "at the well" means before value is added by preparing the raw gas for market. *Judice*, 939 S.W.2d at 137. Therefore,

the unambiguous language of the royalty provisions demonstrates the parties' clear intent that Tana be required to pay royalties on all amounts it actually received from its sale of the raw, unprocessed gas at the well.

Tana sold the raw gas to Fayette at the well. The gas contract did not state a fixed price for the gas. It stipulated that the price for 100% of the raw gas sold by Tana at the well would be 84% of the resale price of the residue gas and extracted liquids, after treatment. This pricing formula represents the negotiated value of the raw gas. In its motion for summary judgment, the Class argued that, because Tana is obligated to pay royalties on 100% of the total volume of gas sold at the well, Class members are entitled to royalties on the additional 16% of the proceeds from the sale of the residue gas and the extracted liquids after processing—proceeds that were not remitted to Tana under the terms of the gas contract. The Class maintained that it is irrelevant that Tana did not receive and was not owed this portion of the total post-processing sales proceeds. The Class is incorrect.

The Class erred by equating the sale of raw gas at the well to the separate and distinct third-party sales of the residue gas and extracted liquids on the open market. Tana did not sell the residue gas or the liquids; Tana sold raw gas at the well, before value was added by preparing the gas for market. *See id.* In exchange for its sale of 100% of the total volume of raw gas at the well, Tana received a price equivalent to 84% of the proceeds for the processed gas. Tana never received all of the proceeds from the sales of the residue gas and the liquids. Accordingly, by paying the Class royalties based on 100% of the money it actually received, Tana did in fact pay royalties on 100% of the total volume of raw gas that it sold at the well. Thus, as a matter of law, Tana did not

10

breach the lease agreements because it calculated royalties owed to the Class based on the full amount it received from its sale of the raw gas at the well.

### *Post-production costs*

The Class alleged in its motion for partial summary judgment that it was improper for Tana to allow Aquila to deduct compression and treating costs from the sales price of the raw gas Tana sold at the well. The Class averred that the lease agreements forbid these deductions because (1) the costs were incurred after the gas was sold at the well by Tana and then resold at the well by Fayette to Aquila under a different contract at a higher price, and (2) the costs were incurred off-lease and did not add value to the raw gas delivered by Tana to Fayette. Consequently, the Class claimed that Tana breached the lease agreements by deducting post-production costs before calculating their royalties. We disagree.

The underlying royalty provisions provide that Tana is to pay royalties on either the amount it realized or its net proceeds from the sale of the gas at the well. As noted, the Class concedes that the terms "amount realized" and "net proceeds" are synonymous. The supreme court has stated that the term "net proceeds" expressly contemplates deductions, while the phrase "at the well" means before value is added by preparing the gas for market. *Id*. Thus, the plain language of the applicable royalty clauses acknowledges that deductions may be necessary to determine the value of the gas at the well.

It is irrelevant that the post-production costs were incurred after the raw gas was sold twice at the well because (1) the initial gas contract between Tana and Fayette set the price for the

11

raw gas that Tana sold, and (2) the Class's royalties are based on the net proceeds Tana received from the sale of the raw gas at the well. Tana sold the raw gas at the well for a percentage of what the treated residue gas and extracted liquids would be sold for downstream on the open market. Accordingly, the final sales price for the raw gas that Tana sold at the well can only be established by working back from the downstream third-party sales of the residue gas and the extracted liquids to Tana's sale of the raw gas at the well. Tana insists that post-production costs must be deducted in order to ascertain the sales price of the raw gas it sold at the well. We agree with Tana that the first logical step in working back to the at-the-well price for the raw gas is to subtract the costs associated with treating and compressing the gas from the combined post-processing sales proceeds.[6] It is clear that the post-production costs added value to the raw gas sold by Tana. If these costs are not deducted, then the Class's royalties would be based on the proceeds Tana received from its sale of the raw gas *plus* the costs incurred to prepare that gas for sale on the open market. Therefore, Tana's net proceeds cannot be determined unless post-production costs are deducted.

We hold that the Class's lease agreements permit the deduction of reasonable post-production costs. Therefore, Tana did not breach the lease agreements by failing to pay royalties on the amount deducted to cover post-production expenses.

---

[6] Although the cost of compressing the gas was deducted from Tana's sales proceeds, they were fully reimbursed to Tana through a separate agreement. The money Tana received from the compression reimbursement was added to its sales proceeds prior to calculating the Class's royalties. The net effect of the deduction and subsequent reimbursement is that neither Tana nor the Class bore any of the compression costs.

12

*Plant fuel*

In its motion for partial summary judgment, the Class also claimed that Tana breached the terms of the lease agreements by failing to pay royalties on the value of gas that was metered and sold at the well but consumed off-lease by the processor for plant and compressor fuel. It is undisputed that the processor used gas attributable to the Class's leases to operate its plant and run its compressors while treating the gas. In the gas contract, Tana agreed to provide gas to the processor for compression and plant fuel. The gas contract specifically states that Tana "agrees to furnish its prorata share of fuel for said compression at no cost to Buyer" and that Tana was selling all of the gas attributable to Class's leases except the portion that may be "lost or used for compression and treating fuel or in other of Buyer's pipeline system operations." We do not know, nor is it relevant, why Tana agreed to these terms. Our only concern is whether Tana fully complied with its obligations as stated in the lease agreements. *See Alameda Corp.*, 950 S.W.2d at 97.

Under the lease agreements, Tana is to pay the Class royalties on the net proceeds it actually receives from the sale of the raw gas at the well. As discussed above, Tana did not sell the raw gas at a fixed price; it entered into an agreement, under which the price of the raw gas would be contingent upon the downstream sales prices of the treated residue gas and extracted liquids. The gas used by the processor for compression and plant fuel was not sold and, as a result, Tana did not receive any money for this gas. Tana is only obligated under the lease agreements to pay the Class royalties on money actually received; Tana is not required to pay royalties based on the value of gas that was never sold downstream. Accordingly, Tana did not breach the lease agreements by failing to pay royalties on gas consumed by the processor.

13

*Gas-lift fees*

In its motion for summary judgment, the Class argued that Tana breached certain Class members' leases by impermissibly deducting gas-lift fees from the members' royalty payments. The term "gas lift" refers to a method of raising oil by injecting gas into the bottom of the hole to force the oil up. *See* 8 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law, Manual of Terms 441 (2004). Both Tana and the Class agree that the costs associated with this process are considered operational or production expenses. The general rule is that a royalty interest is to be free of production costs. *See Temple-Inland Forest Prods. Corp. v. Henderson Family P'ship, Ltd.*, 958 S.W.2d 183, 186 (Tex. 1997). However, the general rule may be modified by agreement. *See Heritage Res.*, 939 S.W.2d at 122; *Enron Oil & Gas Co. v. Joffrion*, 116 S.W.3d 215, 221 (Tex. App.—Tyler 2003, no pet.). Tana insists that there was no breach in this instance because it was not obligated to pay royalties on gas used in all operations under the applicable lease agreements.[7] We agree with Tana.

A review of the record reveals that Tana periodically used gas, produced from the Class's leases, for gas-lift operations at five of the underlying gas wells. Thirty-six Class members own royalty interests in these five wells. The record includes the lease agreements executed between

---

[7] On appeal, the Class contends that Tana's belief—that the Class is attempting to recover unpaid royalties on gas-lift fees—is incorrect. The Class alleges that its summary-judgment position was that it is entitled to recover the total amount of gas-lift fees deducted by Tana because Texas law provides that a royalty interest is to be free of production expenses. *See Temple-Inland Forest Prods. Corp. v. Henderson Family P'ship, Ltd.*, 958 S.W.2d 183, 186 (Tex. 1997). However, the Class's damages schedules, provided in support of its motion for summary judgment, establish that the Class is, in fact, claiming that Tana breached certain lease agreements by failing to pay royalties on gas-lift fees.

Tana and each of these Class members. Each of these lease agreements contains one of the following provisions:

[1] Lessee may recycle gas for gas lift purposes on the leased premises . . . and no royalties shall be payable on the gas so recycled until such time as the same may thereafter be produced and sold or used by Lessee in such manner as to entitle Lessor to a royalty thereon under the royalty provisions of this lease.

or

[2] Lessee shall have free use of oil, gas, coal and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil gas, and coal shall be computed after deducting any so used.

or

[3] Lessee [Tana] shall have the use, free from royalty, of water other than from Lessor's water wells and of oil and gas produced from said land in all operations hereunder.

or

[4] For the purpose of computing the royalties to which owners of royalties and payments out of production and each of them shall be entitled on production of oil and gas, or either of them, from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit.

The plain language of each of these provisions authorizes Tana to use gas produced from the leases in all operations. In addition, it is clear that Tana was not required to pay royalties on any gas so used. Therefore, Tana did not breach any Class member's lease agreement as a matter of law by deducting gas-lift fees.

15

*Attorney's fees*

In its third amended petition, Tana requested attorney's fees pursuant to the provisions of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 1997). A prevailing party cannot recover attorney's fees from an opposing party unless permitted by statute or by contract between the parties.[8] *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex. 1999). Furthermore, the supreme court has held that a prevailing party in a breach of contract action is not entitled to attorney's fees under section 38.001(8) of the civil practice and remedies code unless they recover damages. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997) (holding that party must (1) prevail on cause of action for which attorney's fees are recoverable, and (2) recover damages in order to recover attorney's fees); *see also Smith v. Texas Farmer's Ins. Co.*, 82 S.W.3d 580, 588 (Tex. App.—San Antonio 2002, pet. denied) (section 38.001 does not provide for attorney's fees in the pure defense of a claim). We have held that Tana did not breach any Class member's lease agreement. Moreover, Tana did not file a claim or counterclaim seeking damages. Without recovering damages, Tana is not entitled to attorney's fees under the civil practices and remedies code. *Green Int'l, Inc.*, 951 S.W.2d at 390.

## Conclusion

We reverse the district court's summary judgment and render judgment that Tana did not breach the lease agreements by: (1) calculating royalties based on the amount it actually received from its sale of the raw gas at the well; (2) failing to pay royalties on amounts deducted to cover

---

[8] Tana did not claim below or on appeal that any member of the Class was contractually obligated to reimburse Tana's legal fees for successfully defending against an alleged breach of contract.

post-production expenses; (3) failing to pay royalties on the value of the raw gas given to the processor for plant and compressor fuel; or (4) deducting gas-lift fees from certain Class member's royalty payments.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Patterson and Puryear

Reversed and Rendered

Filed:   March 10, 2006